**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

TONI BARBARA LEE,

        Plaintiff,

                                            DECISION AND ORDER

vs.                                             05-CV-6733 CJS

JO ANNE B. BARNHART, Commissioner of
Social Security,

        Defendant,

_____

**APPEARANCES**

For plaintiff:                                   Mark M. McDonald, Esq.
                                             Bond and McDonald
                                             91 Genesee Street
                                             Geneva, NY 14456
                                             (315) 789-8480

For defendant:                                 Terrance P. Flynn
                                               United States Attorney
                                             By: Brian M. McCarthy, A.U.S.A.
                                             100 State Street, Room 620
                                             Rochester, NY 14614
                                             (585) 263-6760

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") which denied plaintiff's application for Disability and Supplemental Security Income ("SSI") benefits. Now before the Court is plaintiff's motion for judgment on the pleadings (# 4) and the Commissioner's cross-motion for the same relief (# 6). For the reasons stated below, the Commissioner's motion is denied, and plaintiff's motion is granted. The Commissioner's decision is reversed and remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Plaintiff filed her application for SSI on April 30, 2002. Her claim was initially denied, and she requested a hearing before an Administrative Law Judge ("ALJ") on August 27, 2002. On October 26, 2004, ALJ Grenville W. Harrop, Jr., issued a decision in which he stated that, "[b]ecause there is sufficient evidence to establish disability based upon the evidence in the record, an oral hearing was not held." (Record at 36.) Further, the ALJ determined, based on the evidence in the record now before this Court, that plaintiff was disabled as of April 30, 2002 under section 1614(a)(3)(A) of the Social Security Act. (Record at 40.) On November 17, 2004, however, plaintiff was advised that the Appeals Council decided on its own motion to review the ALJ's decision. On March 7, 2005, the Appeals Council issued a notice and order vacating the favorable decision and remanding the case to the ALJ with specific instructions. (Record at 13.) Plaintiff

was notified of the date, time, and place of the hearing by an Acknowledgment of Receipt (Notice of Hearing). In her acknowledgment, plaintiff stated that she could not be present for the hearing and requested that the ALJ make his decision because, "I cannot drive or ride that distance—it cause [sic] bad spasms, and I can't walk when I try to get out of the car. Thank you?" (Record at 88.)

The same ALJ, who had earlier issued a favorable decision, held the hearing at which only a vocational expert testified. (Record at 23.) Following that hearing, on August 26, 2005, the ALJ issued a decision in which he determined that plaintiff had the residual functional capacity for sedentary work, that there were sufficient jobs in the economy she could perform and that she was, therefore, not disabled. (Record at 21.) On October 18, 2005, plaintiff appointed Mark M. MacDonald, Esq., as her representative to the Social Security Administration. (Record at 9.) On December 1, 2005, the Appeals Council denied plaintiff's appeal making the ALJ's second decision, denying benefits, the Commissioner's final decision in this case. Plaintiff filed a complaint in this Court on December 20, 2005.

## FACTUAL BACKGROUND

Plaintiff was born on July 6, 1967, and is currently 39 years old. She has completed high school and has one year of college. (Record at 143.) Her past work includes the following: stuffing envelopes in a rental store in 1999; nursing assistant from 1991 to 1992; home health aide 1988; and cashier 1984 to 1985.

(Record at 119.)

She described her daily activities in a disability questionnaire dated May 21, 2002. In the questionnaire, she indicated that she was able to perform household activities while alternating between sitting, standing and lying down. (Record at 128.) She claimed a disability arising out of a back injury and stated that she has been unable to work since October 1, 1993. She further stated that she was receiving help from her children with daily chores, such as laundry, dishes and carrying things. (Record at 128.) She also indicated that she experienced difficulty sleeping due to pain and an inability to get comfortable. In addition, she related that she was able to do some grocery shopping once a week for about an hour, explaining that her groceries were loaded at the store and, when she arrives at home, her children carry the bags into the house. She claimed that her normal activities are severely restricted due to pain in her back and that she is unable to sit for an hour at any of her children's events. (Record at 131.) She further indicated that she is unable to do any lifting and that she can sit for only approximately fifteen minutes. Additionally, she claimed that she could not climb stairs, squat, bend or reach, that walking was difficult for her, and she could stand for no more than ten minutes. (Record at 132.)

## MEDICAL EVIDENCE

On October 10, 1995, plaintiff was seen by her treating physician, Stephen D. Lasser, M.D. (Record at 194.) Dr. Lasser wrote in his examination report that plaintiff complained of increasing back pain for the past month, but could not

identify any particular activity that seemed to cause it. She also told him that she was very stiff and painful in the morning and had difficulty performing activities at home because of pain and stiffness. Finally, she told him that her TENS unit was not helping much. Upon examination, Dr. Lasser found that plaintiff was tender across the lower lumbar spine at the L4, L5 level and that her range of movement was 30 degrees painful forward flexion, five degrees of extension, five degrees of lateral flexions bilaterally. However, a neurological exam of her lower extremities was normal with no localizing deficits, and her straight leg raises were negative. Dr. Lasser's impression was chronic low back pain with acute exacerbation. He treated her with Daypro and suggested that she begin doing lumbar stabilization exercises at home, with heat or ice applied to her back. He scheduled her for a follow-up in six weeks. (Record at 194.)

On November 28, 1995, Dr. Lasser saw plaintiff and she again complained of some increasing pain over the past few weeks. She also told him that her pain radiated into her hips bilaterally and that her pain was worse after lying down. She had stopped using Daypro due to its high-cost. On examination, Dr. Lasser wrote that plaintiff was fully ambulatory with a normal gait, that her neural exam was grossly intact, but that her back was diffusely tender around the lumbosacral junction. Once again, Dr. Lasser wrote his impression: "Chronic arthrogenic back pain." (Record at 194.) Dr. Lasser also wrote that plaintiff should continue her level of limited activity, and that she should avoid repetitive bending or twisting or any heavy lifting. He confined her to lifting no more than ten to fifteen pounds. He also prescribed Naprosyn to, as he wrote, "hopefully

lessen the intensity of her pain." (Record at 194).

On February 2, 1996, plaintiff saw Dr. Lasser again complaining of back pain. She told him that prolonged sitting or standing aggravated her symptoms. Upon examination, Dr. Lasser found her ambulatory with a fairly normal gait and that her neural exam was grossly intact. Once again, his impression was that she suffered from chronic arthrogenic back pain, but this time added that she was clinically stable. He encouraged her to resume efforts to seek employment that did not require repetitive bending or lifting, and to keep to a ten to fifteen pound restriction on lifting weights. Finally, he noted that she suffered from a partial disability. (Record at 194.)

On September 11, 1996, Dr. Lasser saw plaintiff again for a re-check of her lower back disability. She reported to him that her symptoms had remained unchanged, but with some increased back pain after prolonged sitting or standing. She also related that in March of 1996, her home had burned and she had to carry both of her children downstairs out of the dwelling. She denied any new injury to her back, but stated that her symptoms "have been a little more since that time." (Record at 193.) Dr. Lasser's impression was, as before, chronic arthrogenic back pain. Dr. Lasser recommended that she continue to use over-the-counter anti-inflammatory agents and wrote, "I don't feel any other specific recommendation at this time except for an exercise program focusing on overall fitness, weight loss and aerobic conditioning. These efforts could help overall positively impact on her chronic pain symptoms." (Record at 193.) He wrote that she had a permanent partial disability.

On May 22, 1997, plaintiff saw Dr. Lasser again for lower back pain. She related she had been doing some lower back exercises daily and was currently trying to lose weight and strengthen the muscles. Dr. Lasser's impression was that her back revealed fairly good range of movement, that she ambulated with a normal gait, and had equal bilateral strength in her lower extremities. He also wrote that the neurologic exam was grossly intact. Once again, his opinion was that she suffered from chronic arthrogenic back pain. He recommended that she continue her current medical regime, which included Orudus, and provided her with a one-year prescription for membership to Bally's Fitness Center. He also wrote that she "would benefit with a general fitness program which concentrates on weight loss, and aerobic conditioning and strengthening." (Record at 193.) Again he wrote that she had a permanent partial disability.

On June 30, 1998, plaintiff saw Dr. Lasser again and complained of increasing low back pain since the damp weather began. She stated that the pain radiated across her belt line, but denied any pain in her lower extremities. Dr. Lasser's examination of plaintiff's lower back revealed forward flexion of 75 degrees, extension ten degrees, right lateral flexion fifteen degrees and left lateral flexion ten degrees. He also determined that she had equal bilateral strength in the lower extremities and that her neurologic exam was grossly intact. His impression was that she had recently exacerbated her chronic arthrogenic back pain. In the recommendations/treatment section, Dr. Lasser noted that plaintiff expressed the desire to return to school to become a licensed practical nurse. He found that appropriate as long as she was not in a hospital or other

situation where she would be required to perform a great deal of lifting. He further wrote that at this time her only restrictions would be no excessive bending, twisting or lifting. Finally, he also noted that she had a permanent partial disability. (Record at 192).

On September 5, 2000, after a two-year absence, plaintiff returned to Dr. Lasser. (Record at 192.) She complained of increasing back pain which had become progressively worse over the last three to four months, but stated she did not recall any specific new injury. In addition, she noted that, in the last month or two, her legs would go numb at night, and would also go numb if she sat on the couch for too long. She also complained that she could not walk more than half a mile to a mile before she had to stop because of lower back pain radiating down both legs into her knees. Dr. Lasser's examination of her back revealed tenderness from L4 to S1 in the midline. Her range of motion was forward flexion about eighty degrees, extension five degrees and lateral flexion twenty-five degrees. He found that reflexes, strength and sensation were equal in both lower extremities. He also found that a straight leg raises on the right side caused low back pain at about eighty-five degrees in the sitting position. He ordered x-rays and wrote in his report that the "spine films today demonstrate really no change from her previous films. Scarred margins noted around the L4, 5 level and SI joints." (Record at 191.) Dr. Lasser wrote in his impression that plaintiff suffered from "chronic arthrogenic back pain, acute exacerbation, rule out discogenic pain." (Record at 191.) He prescribed Ultram for pain and sent her to a few sessions of therapy to relearn her lumber stabilization exercises. He also ordered

an updated MRI scan of her lower spine to rule out further discogenic deterioration. Again he noted a permanent partial disability. (Record at 191).

On November 14, 2000, plaintiff saw Dr. Lasser for a re-check of her lower back. He wrote that she continued with midline low back pain and intermittent muscle spasms, but that she denied any sciatica or numbness and tingling in her lower extremities. He noted that she went to two sessions of physical therapy, but was unable to continue because it increased her pain. (Record at 191.) Dr. Lasser's impression was that she suffered from chronic arthrogenic back pain with recent exacerbation. He provided plaintiff with a prescription for Orudis and wrote that he was currently awaiting authorization for an updated MRI scan to rule out discogenic deterioration. (Record at 191.)

On January 9, 2001, Dr. Lasser saw plaintiff again for a re-check of her low back disability. He wrote that she indicated her level of pain was from four to nine out of as scale of ten, depending on the day. He also wrote that she had been using her home TENS unit with some relief. His examination noted that, although there was some diffuse tenderness in the lower lumbar region, she ambulated well, that she sat with a good upright posture, that no spasms were present in the paravertebral muscles over the L4 to sacrum, and that her neural exam was grossly intact. He gave her a new prescription for Ultram and wrote that he was awaiting authorization for an MRI of her lumbar spine. (Record at 190.)

On May 8, 2001, plaintiff returned to Dr. Lasser with a complaint of lower back pain. He noted that she was working as a day-care provider and that her back pain was present on a daily basis, but that it came and went in intensity. Upon examination he noted that her conditions were unchanged. He also observed that an MRI had been recently obtained and it demonstrated normal looking lumbar discs. (Record at 190.) In that regard, the MRI reported some mild degenerative changes at the L-1, L-2 level which, he noted, was "a level above her symptoms." (Id.) His impression was chronic muscular ligamentous sprain/strain with resulting intermittent low back pain. He recommended that she continue her current work activity and avoid those activities which provoked her symptoms. He noted that he did not think she required any form of surgical intervention, and that she should continue using her current medications. With regard to his disability finding, he wrote "Permanent Moderate Partial." (Record at 190).

On April 19, 2002, plaintiff underwent another MRI of her lumbosacral spine. (Record at 201.) Roger M. Smith Jr., M.D., interpreted the image and compared to a previous study performed in 2001. He noted that at the L-1, L-2 level, she suffered from no disc bulge, herniation, central canal stenosis, or neural foraminal encroachment. He further noted that the L-1, L-2 disc space was smaller than the remainder of the lumbar disc spaces and resembled the width of the thoracic disc spaces, but that it was unchanged in comparison to the previous study. He also noted what he presumed was a hemangioma within the anterior inferior aspect of the L-1 vertebral body, which was again unchanged in

comparison to the previous examination. For the L-2, L-3 through L-5, S-1 spaces, he wrote that no abnormality was identified. Finally, he noted, "[n]o disc bulge or herniation is identified any level. There is no neural foraminal encroachment or central canal stenosis." (Record at 201.) His conclusion was that she had an essentially normal lumbosacral spine without significant interval change compared with the previous study. (Record at 201.)

On April 26, 2002, plaintiff saw David Hannan, M.D., complaining of lower back pain. (Record at 216.) She told him that she had originally injured her back on August 29, 1993, had re-injured it in October, 1993, and had been in and out of work since then. Dr. Hannan reported that her current symptoms were back pain bilateral in low back radiating up to her neck, numbness in both legs which described as coming and going. (Record at 216.) (Dr. Hannan's report appears to be two pages, but the second page is not included in the record).

On June 1, 2002, Dr. Hannan completed a New York State Office of Temporary and Disability Assistance, Division of Disability Determinations form pertaining to plaintiff. (Record at 195-98.) In that form, he indicated that he had first seen plaintiff on October 21, 1993, and had last examined her on April 26, 2002. He listed her weight at 210 pounds, but did not list her height. He stated that her treating diagnosis was mechanical low back pain and listed the following symptoms: "back pain bilocated in low back, radiates up to neck, intermittent stocking-distribution numbness in both legs from tips to toes." (Record at 195.) He also indicated on the form that he had been treating her with Vioxx and Ultram, the latter on weekends only. (Record at 196.) In the form's history

section, Dr. Hannan indicated that plaintiff suffered an initial injury on August 20, 1993, with a re-injury in October 1993. He stated that she was initially evaluated by Dr. Angela Kuettner, who referred plaintiff to Dr. Stephen Lasser, who "followed her four years." (Record at 196.) Dr. Hannan also indicated on the form that plaintiff had an MRI of her lumber spine with negative results and was referred for a nerve conduction study in both legs. (Record at 197.) He also stated that she had no abnormality to her gait, and that her range of motion in her back was as follows: flexion 60 degrees, extension 15 degrees. (Record at 196).

On June 28, 2002, Dr. Hannan followed up with plaintiff. His examination revealed that plaintiff's range of motion was flexion and 20 degrees extension five degrees, RSF[1] 30 degrees, LSF 15 degrees, R ROT 40 degrees, L ROT 40 degrees. Dr. Hannan's assessment was that she suffered from, "mechanical low back pain, and right sciatica." He concluded that she should continue treatment as ordered. (Record at 215).

Also on June 28, 2002, plaintiff visited Simone Chiropractic as a result of a prescription from Eugene Tolomeo, M.D. (Record at 256, 257.) After receiving treatment, Marianne Santelle, D.C., noted on February 4, 2003, that plaintiff was 100 percent disabled due to a prior work injury and her diagnosis was "[s]evere muscle damage to the Quadrant Lumborum bilaterally referring pain to the R posterior leg," and "[n]eurological symptoms causing numbness in the anterior thighs bilaterally." (Record at 269.)  Dr. Sentelle noted that activities of daily living

---

[1]The abbreviations, "RSF" and ROT are not explained in his notes.

tended to aggravate the muscles in her lower back and therefore plaintiff's ability to engage in activities of daily living was limited. (Record at 269).

On August 10, 2002, plaintiff returned to Dr. Hannan for her low back pain. She reported to him that she had been seeing a chiropractor two times per week but continued to suffer from lower back pain and sciatica. Dr. Hannan reviewed a June 18, 2002 note from Dr. Tolomeo, in which Dr. Tolomeo noted that plaintiff had mild right L5/S1 radiculopathy. Dr. Hannan's examination revealed flexion extension approximately the same as on the visits of June 28, 2002. He continued her on medications and noted that she declined physical therapy and cortisone injections. He also noted that she would not see Dr. Lasser again but would see Dr. Tolomeo on September 18. (Record at 214).

On September 18, 2002, plaintiff saw Dr. Tolomeo to followup with regard to her back pain. (Record at 280.) He reported that she was improved with maximum conservative therapy and that chiropractic manipulation, along with medication, had helped her. His impression that was that her back pain was secondary to musculoskeletal complaints. He wrote that she was doing well with conservative therapy on "NSAIS's [sic] and muscle relaxants" and was also undergoing chiropractic manipulation, which was helping. He changed one of her pain medications as a result of some concern about blood pressure changes she was undergoing, but stated that otherwise he did not foresee changing her management. (Record at 280.)

On June 8, 2004, Dr. Hannan completed a Medical Source Statement of Ability to Do Work-related Activities (Physical). (Record at 241-44.) He noted that she had lifting and carrying limitations, that she could occasionally lift less than ten pounds and frequently lift less than ten pounds. He also noted that her standing and walking were affected by her impairment in that she could stand and or walk less than two hours in eight hour workday. He further reported that she could sit for less than six hours in eight hour workday and that pushing and pulling were limited in her upper and lower extremities. On the portion of the form that asks, "[w]hat medical/clinical finding(s) support your conclusions in items 1-4 above?" He wrote, "patient's description of symptoms. Attached neurologist reported." (Record at 242.) Additionally, Dr. Hannan indicated that plaintiff could never climb, balance, kneel, crouch, crawl, or stoop. With regard to manipulative limitations, he said she was limited in reaching all directions, including overhead, limited in handling, limited in fingering, and unlimited in dealing. He also noted that she could occasionally reach, handle, and finger. He determined she had no limitations in visual or communications areas. (Record at 243.) He reported no environmental limitations. (Record at 244.) The attached neurological report to which Dr. Hannan evidently referred, is included in the record immediately following his report. (Record at 245.) It consists of a letter from Dr. Tolomeo dated September 18, 2002, in which Dr. Tolomeo reported that plaintiff is doing well with conservative therapy.

On April 4, 2005, Dr. Hannan completed a second Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Record at 286.) This report is essentially duplicative his first report, described above. However, in the portion that asks, "[w]hat medical/clinical findings support your conclusions in items 1-4 above?" He wrote simply, "patients description of symptoms." (Record at 287).

On April 18, 2005, plaintiff underwent a consultant neurological examination by James Naughton, D.O. (Record at 295-97.) After a complete physical examination, Dr. Naughton diagnosed that she has lower back pain per her history and that she had no restrictions seeing, hearing, talking, sitting, standing, walking, or climbing stairs. He determined that she had a mild restriction with regard to bending, lifting, and carrying. Finally, he determined she had no restrictions for pushing, pulling, reaching, or handling objects. (Record at 297.) Dr. Naughton also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (Record at 298-301.) He noted that she could stand or walk at least two hours in an eight hour workday and could sit about six hours in an eight hour workday. With regard to the medical/clinical findings that supported his conclusions, Dr. Naughton observed that plaintiff could walk on her heel and toes only with assistance, that she could perform straight leg raises only to 45 degrees left, and seated at 90 degrees. He also noted that her spine flexion was 60 degrees and that she had a left-sided spasm and tender lumbar spine.

## ANALYSIS

### *Issues Presented*

The issues plaintiff presents in this appeal are: (1) whether the ALJ improperly rejected the opinions of treating physicians and arrived at improper residual functional capacity; (2) whether the ALJ failed to comply with the Appeals Council's remand order; (3) whether the ALJ failed to make a proper non-severity determination; (4) whether the ALJ failed to properly inform plaintiff of the significance of her waiver of counsel; (5) whether the ALJ failed to fully develop the record; and (6) whether the ALJ failed to properly assess plaintiff's credibility.

### *Standard of Review*

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). It is well settled that

> it is not the function of a reviewing court to determine de novo whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at 231-32. Where there are gaps in the administrative record or where the

Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Id*. at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id.*

### The Standard for Finding a Disability

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Social Security Act Section 223(d)(1)(A), 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501. The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

> First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501(citations and internal quotation marks omitted).

***Treating Physician Rule***

The law gives special weight to the opinion of the treating physician. The SSA's regulations provide:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The various factors applied when the treating physician's opinion is not given controlling weight include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *Id.* The regulations further provide that the SSA "will always give good reasons" for the weight given to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) (2004); *see also*, *Schaal*, 134 F.3d at 503-504; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

***Discussion***

Plaintiff's first point on her appeal is that the ALJ improperly rejected the opinions of treating physicians and arrived at an improper residual functional capacity ("RFC") determination. Plaintiff contends, and the Court agrees, that Dr. Hannan's assessment essentially limited plaintiff to less than sedentary work and for less than a full eight-hour day. (Record at 241-44.) As the Court noted above, a treating source's opinion is entitled to controlling weight if it is well

supported by the medical findings, and not inconsistent with other substantial evidence. The ALJ discounted Dr. Hannan's opinion that plaintiff was essentially disabled, because the doctor's conclusion was based on plaintiff's subjective complaints unsupported by medical treatment notes, or objective evidence. (Record at 18.) The Court agrees that Dr. Hannan's conclusion, that plaintiff could not sit or stand in a combination of hours that would equal a normal workday, is not sufficiently supported to require that it be given controlling weight. However, as plaintiff points out, if the treating physician's opinion is not given controlling weight, the ALJ is required to consider six factors enumerated in the Commissioner's regulations, and provide a good reason for the weight, if any, to be given to such opinion. 20 C.F.R. § 404.1527(d)(1)-(6) (2000). The Court finds that the ALJ failed to sufficiently elaborate on these six factors. (Record at 18.) Consequently, the Court finds that the ALJ did not apply the correct legal standard in assessing Dr. Hannan's RFC opinion.

The ALJ also rejected chiropractor Marianne Santelle's assessment of total disability because the treatment records showed plaintiff had periods of pain relief while in treatment, and because she had not seen Dr. Santelle since February 2003. On this latter point, the record is at odds with the ALJ's finding. Contrary to the Commissioner's contention (Def.'s Mem. of Law at 10-11), the record conclusively shows that plaintiff sought further chiropractic treatment through mid-2005. (Record at 309.) Further, Dr. Sentelle's notes indicated that plaintiff continued to have symptoms even after treatment. (Record at 309.) Therefore, the Court finds that the ALJ failed to apply the correct legal standard

in assessing Dr. Sentelle's conclusions.

Moreover, it is well-settled that "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)."  *Pronti v. Barnhart*, 339 F. Supp. 2d 480, 490 (W.D.N.Y. 2004) (quoting Social Security Ruling 96-8p). As in *Pronti*, here the ALJ did not explain the basis of his RFC finding. Accordingly, the Court finds that the ALJ misapplied the legal standard in making his sedentary RFC determination.

Plaintiff also contends that the ALJ's decision fails to comply with the Appeals Council's remand order. The Appeals Council remanded the case on the basis of its determination that Dr. Hannan "did not provide current clinical, diagnostic or treatment information to support" in his June 8, 2004 assessment. The Appeals Council specifically noted that Dr. Tolomeo's assessment of September 18, 2002, conflicted with Dr. Hannan's assessment, since Dr. Tolomeo wrote that plaintiff had improved with maximum conservative therapy. Further, the Appeals Council noted that the April 2002 MRI showed that plaintiff's lumbar spine was essentially normal. The Appeals Council, therefore, specifically directed the ALJ to, "obtain any available and updated records from [plaintiff's] treating sources, a consultant neurological examination, evidence from a medical expert and, as necessary, a vocational expert." (Record at 72.) The Appeals Council also directed the ALJ to give further consideration to plaintiff's subjective statements and all the medical opinion evidence in reassessing

plaintiff's maximum sustained RFC. (Record at 72.) The ALJ, however, failed to request clarification from Dr. Hannan with regard to the discrepancies in his report that were pointed out by the Appeals Council. Additionally, the Appeals Council specifically directed that the ALJ obtain "evidence from a medical expert . . . ." (Record at 72.) The Commissioner's own regulations specifically direct that, "[t]he administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b) (2006); 20 C.F.R. § 416.1477(b) (2001); *see Houston v. Sullivan*, 895 F.2d 1012, 1015 (5th Cir. 1989) (citing 20 C.F.R. § 404.977(b)). The Court finds that the ALJ failed to fully comply with the Appeals Council's order.

Furthermore, plaintiff argues that the ALJ failed to make a proper non severity determination. Specifically, she contends the ALJ erred by failing to consider whether plaintiff's obesity was a severe impairment. Social Security ruling 02-01p provides in pertinent part that,

> We will consider obesity in determining whether:
>
> The individual has a medically determinable impairment. See question 4.
>
> The individual's impairment(s) is severe. See question 6.
>
> The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings. See question 7. (We use special rules for some continuing disability reviews. See question 11.)
>
> The individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy. However, these steps apply only in title II

and adult title XVI cases. See questions 8 and 9.

* * *

When the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI, we may ask a medical source to clarify whether the individual has obesity. However, in most such cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity.

SSR 02-01p § 3-4 (65 FR 31039, May 15, 2000). In this case, although the record does not contain a diagnosis of obesity, it does have consistent references to high body weight. The consultative examiner noted that plaintiff weighted 230 pounds and was five feet, two inches tall. (Record at 18, 296.) A March 18, 2005 note in Dr. Hannan's medical records for plaintiff show her weight at 227 pounds on that date. (Record at 290.) Entries in Dr. Hannan's medical records for October 25, 2004, November 1, 2004, December 2, 2004, December 28 2004, January 31, 2005, August 12, 2005, and August 30, 2005, show her weight at 227 pounds, 232 pounds, 233 pounds, 232 pounds, 227 pounds, 225 pounds, and 222 pounds, respectively. (Record at 291-94, 305.) Accordingly, the Court determines that the ALJ failed to apply SSR 02-01p in the sequential evaluation process. *See Wood v. Barnhart*, No. 05-CV-6401-CJS, 2006 WL 2786825, *1 (W.D.N.Y. Aug. 9, 2006) ("The Commissioner concludes that, 'Remand is necessary so that evidence of plaintiff's obesity may be considered with regard to her severe musculoskeletal and respiratory impairments.'").

Plaintiff further maintains that the ALJ failed to properly assess plaintiff's credibility. (Pl.'s Mem. of Law at 13.) As noted above, plaintiff informed the ALJ she was unable to appear at the hearing, which was subsequently conducted in her absence. The ALJ, thus, was unable to assess her credibility face to face and only determined on the basis of the record that her complaints were out of proportion to what the medical evidence indicated. The Commissioner's regulations with regard to credibility assessment state:

> (3) Consideration of other evidence. Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms.

20 C.F.R. § 404-1529(c)(3) (2006). Social Security Ruling 96-7p expands on this regulation by stating,

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

SSR 96-7p(3) (Jul. 2, 1996). Consequently, even though objective medical evidence may have been lacking, the ALJ could not, under the Commissioner's rules, reject plaintiff's subjective complaints outright. *See Meyer v. Schweiker*,

549 F. Supp. 1242, 1247 (W.D.N.Y. 1982) (application of objective evidence standard to plaintiff's complaints was erroneous given the rule that "objective" medical evidence need not accompany evidence of subjective pain to establish a finding of disability.). The ALJ also rejected plaintiff's complaints in part because she was reported to have declined further physical therapy and injections. (Record at 214, 218.) However, the ALJ failed to obtain plaintiff's reasons for rejecting those treatment options, and therefore, could not use that information to draw any adverse inferences against plaintiff. SSR 96-7p ("the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.").

Finally, plaintiff contends that the ALJ failed to inform her of the significance of her waiver of counsel.   (Pl.'s Mem. of Law at 10.) At oral argument, counsel for the Commissioner candidly conceded that the case should be remanded. Since plaintiff is now represented, and the matter will be remanded for a new hearing, this issue is moot.

**CONCLUSION**

Plaintiff's motion for judgment on the pleadings (# 4) is granted, and the Commissioner's decision is reversed pursuant to the fourth sentence of 42 U.S.C.   405(g) and the matter is remanded. Consequently, the Commissioner's motion (# 6) is denied.

SO ORDERED.

Dated:   November 16, 2006
            Rochester, New York

ENTER.

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Court